IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| ALICE M. HUFF TURK, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:15-cv-00073 |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner, | ) | By:    Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Alice M. Huff Turk ("Turk") asks this Court to review the Commissioner of

Social Security's ("Commissioner") final decision denying her application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The

case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). Having considered the

administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's

decision is not supported by substantial evidence and that the case must be remanded for further

administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through

four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Turk protectively filed for DIB on December 29, 2011, alleging disability caused by a herniated disc with bone deterioration in her back and arthritis in her knees. Administrative Record ("R.") 64, ECF No. 9. She alleged an onset date of April 12, 2010, at which time she was thirty-nine years old. *Id.* Disability Determination Services ("DDS"), the state agency, denied her claims at the initial, R. 64–73, and reconsideration stages, R. 75–87. On April 9, 2014, Turk appeared with counsel and testified at an administrative hearing before ALJ Brian P. Kilbane. R. 45–63. A vocational expert ("VE") also testified at this hearing regarding the nature of Turk's past work and her ability to perform other jobs in the national and local economies. *See* R. 59–62.

ALJ Kilbane denied Turk's claim in a written decision issued on April 24, 2014. R. 21–37. He found that Turk had severe impairments of degenerative joint disease of the bilateral knees, degenerative disc disease with disc herniation, and obesity. R. 23. Turk's other medically determinable impairments, including migraines, irritable bowel syndrome, affective disorder, and anxiety disorder, were deemed non-severe because they did not result in more than minimal work-related limitations. R. 24–25. Next, none of Turk's impairments, alone or in combination, met or medically equaled the severity of a listed impairment. R. 25–26. As to Turk's residual functional capacity ("RFC"), she could perform sedentary work[1] with some additional limitations. R. 26. Specifically, Turk could sit normally with normal breaks and stand for at least

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

3

thirty to forty-five minutes at a time and walk at least twenty to thirty minutes at a time during an eight-hour workday; walk short distances without any assistive device, but would require a cane for long distances and uneven terrain; lift and carry twenty pounds occasionally; infrequently bend, stoop, crouch, and squat; and frequently reach, handle, feel, grasp, and finger. *Id.* As such, Turk could not return to her past relevant work, all of which was classified at the light exertional level or greater. R. 35–36. Turk could, however, perform sedentary jobs identified by the VE, such as assembler, inspector/grader, and machine operator, which existed in significant numbers in the national and local economies. R. 36–37. Therefore, ALJ Kilbane determined that Turk was not disabled. R. 37. The Appeals Council denied Turk's request for review, R. 1–4, and this appeal followed.

III. Facts

A.    *Relevant Medical Evidence*

On July 31, 2009, an X-ray of Turk's right knee showed some degenerative changes, specifically joint space loss involving the medial and patellofemoral compartments. R. 282. An MRI from the same day likewise showed degenerative changes of the medial and patellofemoral joints with high signal in the medial meniscus, as axial imaging showed a joint effusion, patellar cartilage thinning involving both the medial and lateral facet, and some anterior osteophytes. *Id.* Medial and lateral collateral ligamentous complexes, anterior and posterior cruciate ligaments, and quadriceps and patellar tendons were intact. *Id.*

Turk began seeing Terry Pleskonko, D.C., in April 2010. R. 424. She treated regularly with Dr. Pleskonko for the entirety of the relevant period. R. 423–38, 495–96. Dr. Pleskonko's notes are entirely handwritten, difficult to read, and for the most part appear to be a recitation of Turk's subjective report from each visit. *Id.* That said, on April 21, 2010, Dr. Pleskonko did note

4

a clinical impression of subluxation of L5 and left sciatica. R. 424. Additionally, an X-ray of the left side of Turk's pelvis showed mild left lumbar curve, significant decrease in lordosis, and a decrease in L5-S1 disc height, which he interpreted as severe spondylosis at L5-S1 and short left leg with resultant pelvic and lumbar compensation, R. 436. On February 15, 2012, Dr. Pleskonko noted a clinical impression of subluxation of L5 and the right sacroiliac ("SI") joint with lumbalgia and left sciatica, and subluxation of C5 and T10 with cervicalgia and thoracic pain. R. 424.

On June 17, 2010, Turk began treatment with Kimberly Bird, M.D., who would become her primary care physician. R. 344–45. Turk presented with a chief complaint of "24/7" back pain in the lumbar area radiating down to her left leg, which she had suffered since moving from one house to another the previous November. R. 344. Turk noted that she had been seeing Dr. Pleskonko since April 2010 on a weekly basis and that she had not worked since that time on Dr. Pleskonko's recommendation. *Id.* Turk also relayed Dr. Pleskonko's finding, based on X-rays he took, that she was missing the L4 vertebra, which Dr. Pleskonko believed to have disintegrated. *Id.* On examination, Dr. Bird observed that Turk appeared uncomfortable, and her deep tendon reflexes at the knees and ankles were equal, motor strength was normal but painful, straight leg raise testing was exceedingly painful on the left, sensation to light touch was intact, and there was no spinous process tenderness in the back, but there was extreme tenderness and pain in the left SI area where swelling versus a muscle spasm was palpated. R. 344–45. Dr. Bird assessed back pain, started Turk on Naproxen, Flexeril, and Vicodin, and provided a trigger point injection in the tender left SI area. R. 345. Bird returned for a follow up on June 29 and reported no relief from the injections or chiropractic treatments. R. 346. Dr. Bird noted that Turk again

appeared uncomfortable and that her back exam remained unchanged. *Id.* Dr. Bird prescribed Celebrex, Skelaxin, and Lidoderm patch and referred Turk to physical therapy. R. 347.

Turk presented to Rhonda Lambert, MPT, on July 27 for an initial consultation. R. 339. MPT Lambert noted that Turk was presently taking only Tylenol PM as she had been taken off all other medications at the recommendation of George Damewood, M.D., who was concurrently treating Turk for Bell's Palsy. *Id.* Turk said she could do basic activities of daily living, but at times required help bathing, needed help with housework, and could drive. R. 340. MPT Lambert conducted a physical examination, which revealed Turk's active range of motion for her lumbar spine to be 25% of normal for both flexion and extension and bilateral pain in the posterior SI spine, but full range of motion bilaterally with sidebending and rotation; strength of the extensor hallucis longus was 4+/5 on the right and 5/5 on the left, dorsiflexion was 5/5 bilaterally but with pain on the left, quadriceps were 5/5 on the right and 4+/5 on the left with pain, hamstrings were 5/5 on the right and 4+/5 on the left with pain,[2] seated hip flexion was 5/5 on the right and 4-/5 on the left with pain; sensation to light touch was intact in the bilateral lower extremities; and gait was antalgic, leaning to the left. R. *Id.*

On July 29, Turk followed up with Dr. Bird, again stating she received no relief from the Celebrex, Skelaxin, or physical therapy. R. 337. Although Dr. Bird noted that Turk generally appeared pleasant and had no spinous process tenderness in her back, she continued to have tenderness of the SI area. *Id.* Dr. Bird assessed back pain, radicular syndrome of lower limbs, and joint pain in the pelvis, and she started Turk on Diazepam and Dilaudid. R. 338. Turk reported to Dr. Bird on September 13 that she had no relief from anti-inflammatories, Vicodin,

---

[2] The treatment notes for quadriceps and hamstrings list strength results for the right twice, but nothing for the left. Because the results for other extremities follow a pattern of right then left, the most reasonable reading of this note is that the second entry for the quadriceps and hamstrings is the results for the left.

6

Neurontin, lidocaine patches, Depo-Medrol injection, or Toradol, and that physical therapy had not helped either. R. 330. She appeared tearful and uncomfortable. Back examination revealed no spinous tenderness or palpable muscular spasm, and the remainder of the exam was unchanged. *Id.* Dr. Bird noted that Turk was unable to complete an MRI because she could not tolerate the claustrophobic environment. R. 331. She began looking into arranging an MRI with sedation. She increased Turk's neurontin, started a stronger narcotic, and provided a disabled car sticker. *Id.*

On October 5, Turk was admitted to the Bath Community Hospital Emergency Department with a chief complaint of low back pain for the past year, which was noted to be obvious whenever she moved her left leg. R. 297. She said the pain worsened when she bent down to pick up a coat from the floor, then was unable to get up on her own. *Id.* A CT scan showed mild multilevel degenerative changes, greatest at L5-S1 where there was severe disc space narrowing and gas in the disc, with osteophytosis and disc space narrowing at T12-L1 and L5-S1. R. 295. A diffuse disc osteophytic bulge at L5-S1 also caused effacement of the thecal sac, but there was no significant neuroforaminal narrowing, and the visualized prevertebral and paraspinous soft tissues were unremarkable. *Id.* A physical exam also revealed mild edema, but Turk's pain significantly improved after taking Hydromorphone, Flexeril, Toradol, Ativan, and Solu-Medrol. R. 297. Although Turk was discharged the same day and could walk to her car, R. 298, she returned the following afternoon via EMS, R. 286. Turk reported pain in her hip that radiated through her left leg to her foot. R. 286, 290. She had 5/5 strength in the lower extremities and no edema, light touch and pain sensation were intact, deep tendon reflexes were 2+ and equal in the knee and ankle jerk, and straight leg raise testing was positive on the left. R. 291. Noting Turk's positive straight leg raising tests and radicular pain, the treating physician

7

assessed possible herniated disc. *Id.* Turk received Toradol, Aleve, and two doses of Dilaudid as well as Bactrim for urinary tract infection. *Id.*

Turk visited Dr. Bird three more times in 2010, complaining of back pain and persistent left foot swelling. R. 321–26. On October 11, Turk appeared comfortable despite reporting pain of 9/10. R. 323. She was tearful, but Dr. Bird noted she was alert considering the amount of pain medications she was taking. *Id.* Dr. Bird added diazepam, a muscle relaxer, to Turk's prescriptions. R. 324. During the other visits, Dr. Bird noted few findings on examination, most of which were generally normal, and no edema in the extremities on November 1, R. 321, and trace edema in the extremities on November 15, R. 325.

Turk then visited Matthew Pollard, M.D., for a comprehensive orthopedic exam on December 7. R. 305–06. She complained of constant back pain with associated paresthesia, which was made worse with activity and movement and radiated through the left lower extremity to her foot. R. 305. Dr. Pollard noted that Turk stood with an erect posture and ambulated normally without difficulty. *Id.* Findings for the extremities were unremarkable, with normal passive range of motion, no crepitation, 5/5 strength, no abnormal tone or rigidity, and no pain with rotation. *Id.* Normal thoracic kyphosis was noted, and range of motion in the lumbar spine was normal and painless, although tenderness was noted in the lower lumbar segments, and straight leg raise testing was positive on the left. R. 306. Dr. Pollard assessed herniated lumbar disc with severe nerve compression resulting in chronic (1 year) severely symptomatic left lumbar radiculopathy. *Id.* He discussed treatment options, including surgery in the form of a microdiscectomy, and noted that Turk would return in two weeks. *Id.* During the follow-up on December 30, Turk reported that she still experienced severe pain. R. 307. Dr. Pollard reviewed her imaging showing a large herniated nucleus pulposus ("HNP") and disc space collapse at L5-

S1. *Id.* Dr. Pollard again conveyed the different treatment options available, including continued medical care, epidural steroid injections ("ESI"), or surgery (L5-S1 discectomy or discectomy and fusion), but noted that Turk was hesitant because she lacked insurance. *Id.* Dr. Pollard also offered to refer her to the pain center for an ESI or to the University of Virginia ("UVA") to see if either could help. *Id.*

Turk saw Dr. Bird five times during the ensuing year and a half regarding her back and knee issues. On March 14, 2011, she complained of getting no pain relief from her medications, experiencing increasingly sore knees, and losing balance and falling. R. 384. During examination, Turk appeared uncomfortable and tearful, and she displayed tenderness proximal and distal to the right kneecap, but no effusion, and tenderness in the left anserine bursa and lateral joint line area. *Id.* Dr. Bird noted that Turk was taking three, rather than the prescribed four, Dilaudid because of cost concerns. She also opined that an MRI of Turk's right knee taken a year before showed extensive degenerative disease. Dr. Bird added amitriptyline to her medications. R. 384–85. On May 10, during a visit for a possible urinary tract infection, Turk reported that the anti-inflammatory medication helped her knees, even though Dr. Bird noted that it also caused edema; Dr. Bird decided to keep her on the medication, however, as it was the only one that had provided relief thus far. R. 380. Turk expressed her frustration at not qualifying for financial assistance to get back surgery. On September 12, Turk expressed discontentment with continuing to take so many medications without any relief and reported that she stopped taking Lasix and potassium. R. 376. Turk was frustrated by poor results from physical therapy, transcutaneous electrical nerve stimulation, and anti-inflammatory medications, and she depended on high-dose narcotics which only dulled her discomfort. *Id.* She also reported being denied financial assistance at four hospitals even though she qualified for a sliding financial scale

with Dr. Bird's office. A physical examination revealed tenderness in the low lumbar/sacral area, positive straight leg raising test left greater than right, and dysesthesia in the lateral side of the left leg from the buttock to the little toe. R. 377. On January 27, 2012, Dr. Bird noted that Turk had not come in recently because of a lack of finances and that she could not afford her antibiotics. R. 374. On June 19, Turk followed up for her back pain and reported similar frustrations about the ineffectiveness of her pain medications and her inability to qualify for assistance at any of the area hospitals. R. 408.

Imaging of Turk's lumbosacral spine from June 21 showed changes of degenerative disc disease at L5-S1 because of moderate to severe narrowing of the L5-S1 disc space with a vacuum phenomenon, but all other disc spaces maintained normal heights, vertebral alignment was normal, and there were no acute bony abnormalities. R. 394.

On September 21, Turk returned to Dr. Bird, who noted that she appeared tearful and discouraged. R. 444. Dr. Bird switched her from Diazepam to Skelaxin because it worked better. *Id.* On February 1, 2013, Turk told Dr. Bird that back and leg pain had gotten worse and limited her to standing for no more than thirty minutes. R. 471. She was in no acute distress and had no clubbing or edema in her extremities. *Id.* Dr. Bird instructed Turk to reapply for a discount program at Augusta Health and to check with Dr. Pollard regarding what it would cost for him to see her. R. 472. On May 10, Turk said Dr. Pollard's office had not approved her for financial assistance, and she complained about a bill for lab work being sent to collections. R. 479. Turk reported falling, hitting her head, and losing consciousness, but Dr. Bird questioned her report of losing consciousness and thought her head injury sounded more like a mild concussion. *Id.* Dr. Bird noted mild edema of the extremities and mild irritation of the fifth toe on the left foot. R. 480.

10

On October 21, Turk treated with Ruth Holmass, NP, for an initial evaluation of her chronic low back pain. R. 499–500. NP Holmass noted that Turk currently took Neurontin, Effexor, Skelaxin, and Dilaudid for her pain. R. 499. A physical examination revealed limited range of motion in all directions, paraspinal (but no vertebral) tenderness, antalgic gait and frequent shifting of position while seated, and +3 left patellar and +2 right patellar strength. R. 500. Additionally, a straight leg raising test could not be completed because of pain. *Id.* NP Holmass recommended that Turk continue the same medications. *Id.*

B.    *Opinion Evidence*

1.    *Treating Providers*

a.    *Dr. Bird*

Over the course of treatment, Dr. Bird completed two physical capacity evaluations regarding Turk's functioning. First, on August 13, 2012, Dr. Bird opined that Turk could sit for three hours, stand for one hour, and walk for one hour, and she would need to ambulate from sitting every thirty minutes during an eight-hour work day. R. 401. Turk had no problems with her hands or right foot, but could not use her left foot for repetitive movements. R. 402. She could lift and carry ten pounds occasionally, but nothing more, and she could frequently reach above shoulder level, occasionally bend and crawl, and never climb or squat. R. 403. She was not restricted from exposure to dust, fumes, gases, and marked changes in temperature and humidity, moderately restricted from driving automotive equipment and being around moving machinery, and totally restricted from unprotected heights. R. 404. Her severe pain, corroborated by an MRI, interfered with her sleep, ability to concentrate on job tasks, activities of daily living, and interpersonal relationships, and there was no evidence of malingering. R. 405.

11

On September 23, 2013, Dr. Bird completed a second evaluation, finding that Turk could sit for four hours, stand for two hours, and walk for one hour, and she needed to change positions approximately every hour to relieve pain. R. 482. She had no issues with her hands, but could not use her feet for repetitive movements. *Id.* Turk could lift and carry ten pounds occasionally, but nothing more; occasionally bend, crawl, and reach above shoulder level; and never squat, climb, or stoop. R. 483. She had no restrictions from driving automotive equipment or exposure to dust, fumes, gases, and marked changes in temperature and humidity, but had moderate restrictions involving unprotected heights and being around moving machinery. R. 484. Her severe pain interfered with her sleep, ability to concentrate on job tasks, and activities of daily living, but not her interpersonal relationships, and there was no evidence of malingering. R. 485. In support of these restrictions, Dr. Bird identified an MRI done on November 8, 2010, at UVA that showed L5-S1 disc extrusion with resultant severe narrowing of the left lateral recess, abutting the left L5 nerve root and descending S1 nerve root. R. 485. She noted the diagnosis of L5-S1 disc extrusion compressing the nerve roots provided a definitive etiology of Turk's complaints and this condition was amenable to surgical correction. R. 486.

        *b.*    *Dr. Pleskonko*

Dr. Pleskonko completed three physical capacity evaluation forms regarding Turk's functioning. On September 19, 2012, he opined that Turk could sit for four hours, stand for two hours, and walk for one hour, alternating positions between all three for maximum comfort, during an eight-hour workday. R. 417. She had no problems with her hands or right foot, but could not use her left foot for repetitive movements. R. 417–18. She could lift ten pounds and carry five pounds occasionally (but nothing more), frequently reach above shoulder level, occasionally bend and squat, and never crawl or climb. She had mild restrictions in driving

automotive equipment and exposure to dust, fumes, and gases; moderate restrictions from moving machinery and exposure to marked changes in temperature and humidity; and total restriction from exposure to unprotected heights. R. 419–20. Her severe pain interfered with her sleep, ability to concentrate on job tasks, activities of daily living, and interpersonal relationships, and there was no evidence of malingering. R. 421. Dr. Pleskonko identified positive straight leg raising, Braggard's sign, and Faber Patrick sign, as well as diminished lumbar range of motion, left achilles strength, and left lower leg strength as objective medical evidence in support of his opinion. *Id.*

On September 30, 2013, Dr. Pleskonko offered a second opinion that Turk could sit for three hours, stand for one hour, and walk for one hour during an eight-hour workday. R. 488. She had no problems with her hands, but could not use her feet for repetitive movements. *Id.* She could lift and carry ten pounds occasionally (but nothing more); occasionally reach above shoulder level, bend, and stoop; and never squat, crawl, or climb. R. 489. She had no restriction involving exposure to dust, fumes, and gases, mild restriction involving exposure to marked changes in temperature, moderate restriction involving driving automotive equipment and being around moving machinery, and total restriction involving unprotected heights. R. 490. Her severe pain, corroborated by objective tests, X-rays, and MRIs, interfered with her sleep, ability to concentrate on job tasks, activities of daily living, and interpersonal relationships. R. 493. She showed no evidence of malingering. *Id.*

On March 12, 2014, Dr. Pleskonko opined that Turk could sit for two hours, stand for one hour, and walk for one hour during an eight-hour workday. R. 501. The rest of his assessment remained unchanged from September 2013. R. 501–03, 506. Dr. Pleskonko further explained

that her condition seemed to slowly decline and that he noticed more symptoms and objective findings over time. R. 505.

2.     *Non-treating Providers*

a.     *Dr. Khaja*

On June 23, Minhaj Khaja, M.D., performed a consultative exam of Turk's physical functioning. R. 387–92. Turk reported that she stopped working in April 2010. She said she could stand for thirty minutes, walk one hundred feet, and lift and carry five pounds frequently and twenty pounds occasionally. On examination, Dr. Khaja observed asymmetric limping gait, leaning towards the left, with a limp in the right knee; leg flexion and leg extension of 4/5 on the left and 3/5 on the right; positive straight leg raise testing at 10 degrees bilaterally with severe pain, which caused Turk to cry out; cervical lumbar junction flexion of 30 degrees and extension of 15 degrees; and knee flexion of 120 degrees bilaterally. R. 391. Bilateral hip strength testing could not be performed because of pain. R. 390–91. Dr. Khaja also noted no joint swelling, erythema, effusion, tenderness, or deformity. R. 390. Turk was able to lift, carry, and handle light objects, tandem walk, and rise from a sitting position without assistance, but she was unable to squat and rise, walk on heels and toes, and hop or stand on either foot. *Id*.

Dr. Khaja stated that Turk provided her best effort during the examination. R. 391. He concluded that Turk could sit normally with normal breaks and stand for at least thirty to forty-five minutes at a time and walk at least twenty to thirty minutes at a time during an eight-hour workday; walk short distances without any assistive device, but would need a cane for long distances and uneven terrain; lift and carry twenty pounds occasionally; infrequently bend, stoop, crouch, and squat; and frequently reach, handle, feel, grasp, and finger. R. 391–92. He further

14

opined that Turk's "low back pain extending into her legs appears debilitating and in addition to bilateral knee pain makes activity difficult." R. 391.

### b.     DDS Physicians

On July 5, 2012, as part of the initial review of Turk's claim, DDS expert Luc Vinh, M.D., assessed her physical functioning. R. 64–73. Dr. Vinh found that Turk could perform sedentary work consisting of lifting and carrying ten pounds frequently (with the same maximum capacity for occasional lifting and carrying) and standing or walking for two hours and sitting for about six hours in a normal eight-hour workday. R. 70, 72. He limited Turk to frequent balancing and occasional stooping, kneeling, crouching, crawling, and climbing of ramps, stairs, ladders, ropes, and scaffolds. R. 70. On reconsideration, DDS expert R.S. Kadian, M.D., confirmed Dr. Vinh's findings, except that he concluded Turk could lift and carry twenty pounds occasionally. R. 75–87.

### C.     Turk's Submissions and Testimony

Turk provided information in two function reports as part of her DIB application. R. 196–203, 225–32. Turk reported that she lived with her daughter and her boyfriend. R. 196, 225. She slept three to four hours per night, woke up in pain, and left her house only when necessary. *Id.* She took care of her daughter and intermittently struggled with personal care. R. 197, 226. For example, her boyfriend assisted her with dressing, bathing, washing her hair, and shaving when the pain was too great. R. 226. Turk continued to cook—albeit less frequently than before her impairments developed—a few times per week for one to four hours at a time depending on the meal and her level of pain. R. 198, 227. She completed limited chores, such as laundry, dishes, and some picking up, at a very slow pace, R. 227, and at some point could not do any house or yard work, R. 198–99. She left the house a few times per week and shopped about once per

15

month. R. 199, 228. Her current hobbies included reading, watching movies, sewing, and playing cards with friends, all of which she could do from the couch, but before her injuries she enjoyed hiking. R. 200, 229. Turk's condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. R. 201, 230. At most, she could lift five pounds, stand for thirty minutes, and walk for fifteen minutes. *Id.* She used a cane and was constantly afraid of falling and being unable to get up. R. 202, 231.

At the administrative hearing, Turk testified that her pain developed in the left leg in December 2009 after moving boxes into a new house, but she continued working for a few months to pay bills. R. 53. She stopped working on April 14, 2010, at the recommendation of Drs. Bird and Pleskonko. R. 48. The pain was in her lower back, and it radiated through her hip, down her left leg, and into her foot, causing numbness and tingling. R. 55. Although neither treating provider specifically prescribed her a cane, both endorsed the use of one if it helped because she frequently lost her balance and fell. R. 48–50. She could not afford surgery, despite Dr. Pollard recommending it, and did not have health insurance. R. 50–51. She was presently taking Hydromorphone, Neurontin, and Skelaxin, which caused her teeth to fall out and affected her memory. R. 54. Turk lived with her boyfriend and cooked occasionally; on a good day, she would make a pot of spaghetti or pork chops, but on a bad day, she made just a TV dinner. R. 55. She never cleaned the house and did laundry occasionally with the help of her teenage daughter. R. 55–56. Turk could lift five pounds comfortably, sit for fifteen to twenty minutes at a time depending on the chair, stand for ten to fifteen minutes at a time, and walk for about fifty feet before needing to stop and rest. R. 56–57. She experienced frequent cramps in the back of her left thigh and left calf. R. 56. She spent most of her time lying down and resting for two to three hours, and she slept for about three and a half hours per night. R. 56, 58.

IV. Discussion

Turk asserts that ALJ Kilbane erred in finding that she had the RFC[3] to perform sedentary work. She challenges his evaluation of both her subjective statements regarding her pain and the opinions of her treating providers, Drs. Bird and Pleskonko. Pl. Br. 6–19, ECF No. 14. I find both of Turk's arguments persuasive.

A.    *Severity of Symptoms*

Turk argues that ALJ Kilbane rejected her pain testimony without a legally or factually sufficient reason. *Id.* at 14–19. The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[4] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a)–(b); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects her physical or mental ability to work. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig,* 76 F.3d at 595.

The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R.

---

[3] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[4] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 404.1528(a).

17

§ 404.1529(c)(2). Nonetheless, a claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Craig*, 76 F.3d at 595.[5] The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the objective medical evidence, *id.* (citing 20 C.F.R. § 404.1529(c), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements, *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013).

Although ALJ Kilbane offered many reasons for rejecting Turk's statements about her symptoms and pain, they find little support in the record. First, the ALJ explains that Turk's treatment was relatively limited and conservative overall and that other than an injection, she was primarily treated with medications, physical therapy, and chiropractic treatment, all of which appeared to be relatively effective. R. 34. Turk objects to this characterization of the evidence, Pl. Br. 17, and the record supports her position. The Fourth Circuit has distinguished between a situation in which only conservative care is recommended versus a situation "in which there is any suggestion that [a claimant] required more aggressive treatment yet received conservative treatment for other reasons." *Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015). Here, Dr.

---

[5] The Social Security Administration now cautions that the subjective prong of this analysis should not be approached with an undue focus on the claimant's "credibility." *See* SSR 16-3p, 2016 WL 1119029, at *1. The scope of this inquiry should be limited to those matters concerning the claimant's symptoms, rather than other factors that might otherwise be probative of the claimant's overall honesty. *Id.* at *10. "In evaluating an individual's symptoms, [ALJs] will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Id.* Statements that are internally inconsistent or that are inconsistent with the other evidence of record, however, may lead the ALJ to "determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* at *7.

18

Pollard recommended that Turk undergo an L5-S1 discectomy, but she did not pursue this option for a valid reason: she could not afford it. *See Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment that she cannot afford."). Although the ALJ recognized that Dr. Pollard recommended surgery, he did not acknowledge Turk's many unsuccessful attempts to obtain financing for this procedure. *See* R. 307, 408, 440, 444, 479, 499. His reasons for downplaying the significance of this recommendation—that she did not require frequent hospitalizations, emergency room visits, or ongoing treatment by a specialist—do not hold up. Turk regularly sought treatment for her back and leg pain, including an orthopedic assessment by Dr. Pollard, and she was admitted to the emergency department on back-to-back days for those conditions. On this record, the ALJ's criticism of her treatment is entirely misplaced.

Moreover, on at least a half dozen occasions, Turk expressed frustration at her inability to qualify for financial assistance to obtain the surgery that her doctors recommended she receive to alleviate her pain. Nonetheless, ALJ Kilbane asserted,

> While the claimant alleges an inability to afford treatment, it is generally known that treatment is available at reduced rates or free of charge through free clinics and State facilities for individuals who cannot afford to pay. In this regard, it is noted that the claimant apparently purchases cigarettes as she reportedly smoked for much of the period at issue.

R. 34. Turk takes issue with both stated reasons. She argues that the ALJ did not consider her frequent attempts to obtain the very treatment he said was available and that conflating the purchase of cigarettes with the ability to afford back surgery was improper. Pl. Br. 16. Both reasons given by the ALJ badly miss the mark. The ALJ's comparison of purchasing a couple packs of cigarettes a week with being able to pay for back surgery, which could cost tens of thousands of dollars, offers no support for his implied finding that she could somehow pay for

19

the surgery. Moreover, as Turk noted, the record shows her repeated attempts to qualify for financial assistance at numerous area hospitals to no avail. *See, e.g.*, R. 307, 376, 384, 408, 440, 444, 465, 479, 499. These documented efforts directly contradict the ALJ's wholly unsupported assertion that medical care, presumably back surgery, is available for free or at reduced rates affordable to Turk.

Furthermore, the record directly refutes ALJ Kilbane's conclusion that Turk's treatment was relatively effective. In support, ALJ Kilbane cited Dr. Bird's decision to put Turk back on an anti-inflammatory because, despite causing some swelling, it was the only medication that had provided relief. R. 34 (citing R. 380). Turk, however, consistently reported that she did not get any relief from her medications, *see, e.g.*, R. 325, 330, 337, 376, 384, that physical therapy had not helped, *see* R. 330, 337, and that her chiropractic treatment provided minimal relief, *see* R. 346, 499. Her treating physicians, Dr. Bird and Dr. Pollard, as well as her chiropractor identified her L5-S1 disc herniation with nerve compression as the source of her pain and never questioned the severity of her claims. Thus, the one instance of an anti-inflammatory providing relief does not outweigh the entirety of the record suggesting otherwise. The ALJ also referenced Turk's improvement in her depression despite only taking medication sporadically. R. 34 (citing R. 471). Not only is the purported improvement not clear from the treatment notes the ALJ cited, but even if it were, the effectiveness of medication in controlling Turk's depression, which ALJ Kilbane found to be non-severe, has no bearing on her physical functioning at issue here.

Next, the ALJ noted that "repeated physical examinations have failed to reveal significantly decreased strength, sensation, or range of motion of any extremity, as would be expected with the degree of limitation alleged." R. 34. This observation is mostly accurate, although it does not acknowledge Dr. Khaja's findings of limited lower extremity flexion and

20

extension, NP Holmass's findings of limited range of motion, and numerous observations of antalgic gait. Moreover, treatment providers consistently assessed positive straight leg raise testing and tenderness and occasionally swelling. Furthermore, in his credibility analysis, the ALJ did not discuss the imaging showing moderate to severe narrowing of the L5-S1 disc space and nerve compression, which Dr. Pollard noted caused chronic severe left lumbar radiculopathy. This imaging and the findings of limitations on exam diminish the significance of the ALJ's assessment that the physical findings do not support the degree of limitation alleged.

ALJ Kilbane also reasoned that Turk's failure to report her alleged back and lower extremity pain during numerous visits weighed against her credibility. R. 34. Of the six visits the ALJ cited in support, however, all but one fail to support his reasoning. For example, the ALJ referenced two visits to Dr. Damewood, who treated Turk's Bell's Palsy. *See* R. 302, 334. During Turk's initial consultation, a review of systems revealed that she reported her longstanding history of low back pain that was also recently exacerbated. R. 302. During a follow-up with Dr. Damewood, Turk did deny some lower extremity pain, lending a sliver of credence to the ALJ's reasoning, but a careful examination shows that she only denied pain below the knee. R. 334. The ALJ also cited to the September 21, 2012, visit to Dr. Bird, but that visit was for her back pain, and a review of systems showed that Turk complained of back pain, joint pain, and lower extremity swelling. R. 465. Lastly, the ALJ referenced three additional appointments with Dr. Bird, *see* R. 378, 386, 407, but these visits were for conditions not related to her back and lower extremity pain. More significantly, over the course of four years of treatment, Turk regularly complained of severe back pain. These few instances where Dr. Bird did not document Turk's back pain do not detract from the overwhelming record of those complaints.

Additionally, ALJ Kilbane stated that Turk had been noncompliant with taking her recommended medications, thereby indicating her symptoms were not as disabling as alleged. R. 34. Failure to follow treatment prescribed by a physician without good reason can weigh against the claimant's credibility. *See* SSR 16-3p, 2016 WL 1119029, at *8. Again, however, the examples[6] cited by the ALJ do not provide substantial evidence for his conclusion, and the record contains numerous instances of Dr. Bird expressly stating that Turk had been compliant with her recommended medications. *See* R. 376, 408, 440, 444, 465. Moreover, considering Turk's adherence to her numerous prescriptions and her efforts to obtain surgery, the record simply does not depict a lack of follow through with available treatment.

Last, the ALJ concluded that Turk's activities of daily living—including gardening, studying for and obtaining a GED, caring for personal needs, performing household chores with minimal assistance, preparing meals for three to four hours, driving, shopping, going out independently, handling finances, and visiting with others on a regular basis—suggested a greater level of physical and mental functioning than alleged. R. 34. Turk counters that the ALJ's recitation of these activities selectively ignores her statements qualifying these activities to suggest greater limitation, thus painting an inaccurate description of her day-to-day activity. Pl. Br. 18. Again, Turk has the better argument. For instance, nowhere in the opinion did ALJ Kilbane acknowledge Turk's first function report from March 5, 2012, which indicated several

---

[6] The first example simply contains no indication that Turk was noncompliant with her medications. R. 291. The next example cited by the ALJ is a secondary report by MPT Lambert summarizing Turk's recent treatment history. R. 339. Although MPT Lambert noted that Turk had recently stopped taking her medications, rather than being a matter of voluntary noncompliance, this was done at the recommendation of the doctor treating her Bell's Palsy. *Id.* The third example does indicate that Turk expressed dismay at taking so many medications and that she stopped taking Lasix and potassium. R. 376. Dr. Bird, however, noted on the same page that Turk had been compliant with all her treatment recommendations. *Id.* The fourth example shows that Turk took it upon herself to take Dilaudid three times per day rather than every four hours as recommended. R. 384. ALJ Kilbane neglects to mention, however, that Turk did so out of cost concerns. The last example appears to show that Turk unilaterally decreased her dose of Effexor, but does not otherwise show noncompliance. R. 471–72.

22

problems with her personal care and limited engagement in house or yard work. R. 226–28. Additionally, although she does go out shopping alone, she only does so once a month. R. 199, 228. Moreover, "[a]s courts in both this circuit and elsewhere have recognized, a claimant's ability to perform modest activities of daily living with some assistance is not a reason to reject claims of disabling pain." *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at *12 (W.D. Va. June 24, 2014) (collecting cases). Here, the ALJ selectively referenced portions of Turk's subjective statements without acknowledging other contradictory statements. Without an explanation for why he credited certain statements over others, I cannot find that this reason is supported by substantial evidence.

The vast majority of the ALJ's reasons for questioning the credibility of Turk's report of symptoms are flawed. Accordingly, I find that substantial evidence does not support the ALJ's credibility assessment.

B.      *Treating Physician Opinions*

Turk also contends that ALJ Kilbane improperly rejected the opinions of her treating primary care physician, Dr. Bird, and her chiropractor, Dr. Pleskonko. Pl. Br. 6–14. An ALJ must consider and evaluate all opinions[7] from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 404.1527. The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id.* § 404.1527(c). A treating physician's opinion "is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

---

[7] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).

in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also* 20 C.F.R. §

404.1527(c)(2). Conversely, opinions from non-treating sources are not entitled to any particular

weight. *See* 20 C.F.R. § 404.1527(c).

An ALJ may reject a treating physician's opinion in whole or in part if there is

"persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at

178. The ALJ must "give good reasons" for discounting a treating physician's medical opinion.

20 C.F.R. § 404.1527(c). Furthermore, in determining what weight to afford a treating source's

opinion, the ALJ must consider all relevant factors, including the relationship—in terms of

length, frequency, and extent of treatment—between the doctor and the patient, the degree to

which the opinion is supported or contradicted by other evidence in the record, the consistency of

the opinion with the record as a whole, and whether the treating physician's opinion pertains to

his or her area of specialty. *Id.* The ALJ must consider the same factors when weighing medical

opinions from non-treating sources. 20 C.F.R. § 404.1527(c), (e)(2).

ALJ Kilbane's treatment of Dr. Bird's opinion was inadequate. In assigning Dr. Bird's

opinion little to no weight, the ALJ stated that "[a]lthough some of Dr. Birds [sic] reported

postural limitations are consistent with the residual functional capacity above, the opinion on an

issue of disability is reserved to the Commissioner . . . and her opined limitations . . . would

prevent the claimant from doing even sedentary work . . . ." R. 35 (citations omitted).[8] This

reason is entirely unsupported by the record and is a misstatement of the law. There is nothing

improper about a medical opinion weighing in on a person's functional abilities. *See* 20 C.F.R. §

404.1527(a)(2). Indeed, that is their purpose. *See id.* Such an assessment of specific functional

---

[8] The ALJ's analysis "gets things backwards" *see Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015)
(discussing ALJ's comparison of credibility findings to RFC determination), because he assessed the
accuracy of Dr. Bird's opinion by comparing it to his RFC. Medical opinions inform the RFC, not the
other way around.

capabilities is separate from a finding of disability, which is reserved to the Commissioner, 20 C.F.R. § 404.1527(d)(1); *see also Dunn v. Colvin*, 607 F. App'x 264, 268 (4th Cir. 2015) ("[A] medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone."), even if the sum of that assessment would show a person is so limited that she could not work. Dr. Bird provided an assessment of Turk's functional capabilities, and nowhere in her opinion did she say that Turk was disabled, although Dr. Bird's assessment of limitations would certainly lead to that conclusion.

Moreover, the ALJ's reasoning that Dr. Bird's opinions were "not supported by the longitudinal record with its limited physical findings and generally routine and conservative treatment. . . . [and] not supported by [her] contemporaneous treatment notes," is also flawed. As explained in detail above, the ALJ's characterization of Turk's treatment as generally routine and conservative is not supported by the record. *See supra* Pt. IV.A. Additionally, the ALJ failed to acknowledge significant evidence that appears to support Dr. Bird's conclusions. For example, he failed to discuss MPT Lambert's physical findings, R. 340, and Dr. Pollard's assessment that severe narrowing of the L5-S1 disc space and nerve compression caused chronic severe left lumbar radiculopathy. Additionally, although as a chiropractor Dr. Pleskonko is not an acceptable medical source, his findings and opinions are important to consider in evaluating whether the longitudinal record supports Dr. Bird's opinions, and the ALJ only gives a cursory overview of Dr. Pleskonko's findings, omitting key details that could support Dr. Bird. Therefore, I cannot find that substantial evidence supports ALJ Kilbane's evaluation of Dr. Bird's opinions.

## V. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision. Accordingly, the Court will **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 16, **REMAND** this case for further administrative proceedings, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send a copy of this Memorandum Opinion to all counsel of record.

ENTER: March 29, 2017

Joel C. Hoppe
United States Magistrate Judge